UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEAN WHEELER,

                                    Plaintiff,

                    -v-

PRAXAIR SURFACE TECHNOLOGIES, INC.,

                                    Defendant.

---

21 Civ. 1165 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Sean Wheeler ("Wheeler") brings suit against his former employer, defendant Praxair Surface Technologies, Inc. ("PST"), alleging race discrimination (including a race-based hostile work environment), retaliatiopn, and disability discrimination in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290 *et seq*, and retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*

Pending now is PST's motion for summary judgment. For the reasons that follow, the Court predominantly grants the motion, but denies the motion as to one portion of one claim: Wheeler's hostile work environment claim under the NYSHRL, based on conduct after October 11, 2019, the effective date of an amendment liberalizing the NYSHRL's liability standards. That surviving portion of this claim will now proceed to trial.

## I.    Background

### A.    Factual Background[1]

#### 1.    Wheeler's Responsibilities, Job Titles, and Compensation, and Those of His White Asserted Comparators

Wheeler is a Black man.  *See* Wheeler Decl. ¶ 2.  In January 2011, PST, which manufactures and supplies surface-enhancing materials, hired Wheeler to work as a Material Handler at PST's Orangeburg, New York facility (the "Orangeburg Facility").  JSF ¶¶ 1, 3. Robert Minucci, then a Lead Customer Site Technician, interviewed Wheeler for the position. *Id.* ¶ 4.  Nicole Mitchell, a human resources manager at the Orangeburg Facility, offered Wheeler the position and conducted his initial onboarding.  Wheeler Decl. ¶ 10.

During Wheeler's tenure at PST, each position at the Orangeburg Facility had various tiers, each associated with a recommended salary range.  JSF ¶ 11.  For example, Wheeler's position of Material Handler had five tiers, starting with a "Jr Material Handler" at Tier 1,

---

[1] The Court draws the following facts from the parties' submissions in support of and in opposition to defendant's summary judgment motion.  These include the following: (1) the parties' amended joint statement of undisputed facts ("JSF"), Dkt. 46; (2) PST's Local Rule 56.1 statement, Dkt. 50 ("Def. 56.1"); the declaration of Shawn Matthew Clark in support of the motion, Dkt. 51 ("Clark Decl."), and attached exhibits; the declaration of Nicole Mitchell in support of the motion, Dkt. 52 ("Mitchell Decl."), and attached exhibits; Wheeler's Local Rule 56.1 counter-statement, Dkt. 58 ("Pl. 56.1"); the declaration of Sean D. Wheeler in opposition to the motion, Dkt. 56 ("Wheeler Decl."), and attached exhibits; and the declaration of Jillian L. McNeil in opposition to the motion, Dkt. 57 ("McNeil Decl."), and attached exhibits.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

through to a "Lead Material Handler" at Tier 5. *Id.* ¶¶ 10, 12. Wheeler was hired at Tier 2, as a "Material Handler I," with a salary of $17.50 per hour. *Id.* ¶ 23. All Material Handlers together with their team leaders comprised PST's Shipping/Receiving/Stockroom team. *See* Wheeler Decl., Ex. C at 3 (PST Operational Chart).

At the start of his employment, Wheeler worked primarily in receiving; his job duties consisted largely of receiving, inspecting, and sorting materials and other packages delivered to the Orangeburg Facility and transporting them to their proper destination within the facility. *See id.* ¶ 21. Initially, this work took place in PST's warehouse at 542 Route 303 (the "542 Warehouse"). *See id.* ¶ 22. From his hiring through 2014, Wheeler remained at Tier 2 of the Material Handler position, receiving modest yearly wage increases such that his salary as of 2014 was $19.90 per hour. JSF ¶ 23.[2]

At some point between Wheeler's start and 2013, PST obtained a second warehouse at the Orangeburg Facility, located down the road from the 542 Warehouse at 560 Route 303 (the "560 Warehouse"). Pl. 56.1 ¶ 138. Wheeler maintains that Dennis Benson, a long-time PST employee who, before taking leave around 2012, had been one of two team leaders for the Shipping/Receiving/Stockroom team, was assigned to the 560 Warehouse in 2013, after he returned from an extended leave. *See id.* ¶¶ 139–40. Benson maintained his Warehouse Lead title, a Tier 5 position, largely worked in the 560 Warehouse by himself, and was paid $36.52 per hour. *See id.* ¶ 140; JSF ¶ 20. Wheeler asserts that, at this point, both Benson and Minucci held the Warehouse Lead position, meaning there were two team leaders associated with the same

---

[2] In his Local Rule 56.1 statement, Wheeler describes these raises as "de minimis cost of living pay increases." Pl. 56.1 ¶ 134. Elsewhere, Wheeler suggests that these raises were keyed to yearly performance reviews and merit-based. *See* McNeil Decl., Ex. A ("Wheeler Dep.") at 67–68.

team, Pl. 56.1 ¶ 140; PST counters that Benson's position of Warehouse Lead was distinct from

both that of Wheeler's as Material Handler, Def. 56.1 ¶ 28, and from Minucci's as Lead

Customer Site Technician and Team Leader for Shipping/Receiving/Stockroom, *id.* ¶¶ 23–24;

*see* McNeil Decl., Ex. B ("Minucci Dep.") at 53 ("Q: And in terms of your day-to-day work, did

you share any jobs [sic] responsibility with Mr. Benson? A: Not really, no."). All agree,

however, that at least technically, Minucci was Benson's supervisor in 2014. *See* Def. 56.1 ¶ 30;

Pl. 56.1 ¶ 30.

Around the time Benson returned from leave in 2013, Wheeler was told that he would

train under Benson so that he could take over Benson's responsibilities in the 560 Warehouse

should Benson depart PST or again take leave. Pl. 56.1 ¶ 141. Wheeler began training with

Benson and gradually took over Benson's duties in the 560 Warehouse. *Id.* ¶ 142. When

Benson officially retired in May 2014, Wheeler assumed his responsibilities in the 560

Warehouse. *Id.* ¶¶ 144–47.

After this increase in responsibility, Wheeler sought a raise, promotion, and change of

tier to one he considered commensurate with his new responsibilities. *Id.* ¶ 148. Minucci,

Wheeler's supervisor, recommended him for a promotion to Tier 4, in recognition that Wheeler

was training to "handle [Benson's] position." Wheeler Decl., Ex. D. However, in 2015,

Wheeler received a promotion only to Tier 3, corresponding to the Material Handler II position.

JSF ¶ 23. This promotion came with a salary increase from $19.90 to $23.24 per hour. *Id.* After

Benson retired, PST did not seek out anyone else, internally or externally, to officially fill the

Warehouse Lead role; it maintains that it eliminated that role after evaluating and finding it no

longer necessary at the Orangeburg Facility. Def. 56.1 ¶¶ 31–33. Wheeler contends that, in fact,

he was already functionally performing the Warehouse Lead role. Pl. 56.1 ¶¶ 31–33.

At every annual performance review from this point until Wheeler ceased work at PST, Wheeler requested a raise, promotion, and title change.  He continued to view his official title, tier, and pay as incommensurate with his responsibility and workload.  *See* Wheeler Decl. ¶ 43. In 2016, Wheeler followed up on a meeting with his supervisor, Jim Peterhoff, inquiring with both Peterhoff and Mitchell, a human resources manager, why his title was "Material Handler" when the duties he performed were those Benson had performed as "Warehouse Lead," and why his pay was significantly below Benson's pay at the time of his retirement, and below that which Wheeler felt appropriate for his responsibilities.  *See* Wheeler Decl., Ex. F.  Peterhoff responded that he was trying to achieve for Wheeler a title and role matching his responsibilities, but that others had to buy into the idea, and it was not a sure bet that they would.  *Id.*

In 2017, PST changed Wheeler's title to "Warehouse Coordinator."  JSF ¶ 24.  Wheeler did not advance in tier or pay.  *See id.* ¶ 23.  During the rest of his time at PST, Wheeler did not receive a promotion to a higher tier, although he continued receiving yearly raises after performance reviews.  *See id.* (documenting Wheeler's salary in 2020, when he separated from PST, as $28.32 per hour, up from $23.24 per hour in 2015, when he had been promoted).

Wheeler highlights the salaries and positions held by three white colleagues whom he contends are relevant comparators: Benson, Minucci, and Jeffrey Williams.

As to Benson, Wheeler contends that, although he assumed all responsibilities Benson held before he retired, Wheeler was not promoted to Benson's Tier 5 level and was not paid close to the $36.52/hour rate Benson was making as of his retirement.  *See* Wheeler Decl. ¶¶ 36–38; *id.*, Ex. D (Minucci Letter).  As of his retirement, Benson had worked for PST for approximately 14 years.  *See* Def. 56.1 ¶¶ 25–27 (Benson started in 2000 and retired in 2014).

As to Minucci, he was Wheeler's supervisor as the team lead in the warehouse, although Wheeler contends they performed "the majority of the same job responsibilities." *See* Wheeler Decl. ¶ 45; JSF ¶¶ 13–18.  Minucci started with PST in 2003 and was a Tier 5 employee from at least 2014 through 2022, when his employment with PST ended.[3]  *See id.* ¶¶ 17–18.  In 2014, Minucci made $37.33 per hour; after modest annual raises, he was making $42.30 per hour in 2020.  *Id.* ¶ 18.

As to Williams, he, like Wheeler, held the title of Material Handler, but was classified as Tier 4.  *See id.* ¶ 21.  Williams began working at the Orangeburg Facility in 1973 and became a PST employee in 2000 when PST acquired the facility.  *See* Def. 56.1 ¶ 34.  In 2014, as a Tier 4 Material Handler, Williams made $30.19 per hour; after modest annual raises, he was making $34.73 per hour in 2020.  JSF ¶ 21.

### 2. Perceived Incidents of Racial Bias During Wheeler's Employment at PST

Wheeler details the following incidents and remarks that he contends are indicative of racial animus in the PST workplace.

First, he states, John Gibson, a white male manager at PST though not one of Wheeler's supervisors, Def. 56.1 ¶¶ 98–99, once said to Wheeler that "[B]lack people are lazy and lucky to have jobs." JSF ¶ 51; *see* Wheeler Dep. at 155.  Wheeler responded that "[a]ll [B]lack people are not the same." Wheeler Dep. at 155.  Wheeler states that he was surprised by Gibson's "bold" statement, but that he did not report it because he felt others at PST shared Gibson's views. *Id.* at 155–57.  On a separate occasion, Gibson, after returning from a summer vacation, told Wheeler that "Wheeler" was a slave name, indicating he had gleaned this notion from his

---

[3] Minucci appears to have been terminated from his employment with PST after being accused of calling Cliff Brown a racial slur. *See* Minucci Dep. at 66.

travels. *Id.* at 176–77. This conversation made Wheeler feel extremely uncomfortable, especially in light of the disdain Gibson had expressed for Black people. *See* Wheeler Decl. ¶ 67.

Second, Wheeler states that, multiple times during his employment, he heard Minucci refer to other Black employees of PST who had been terminated or passed over for advancement opportunities and state that these outcomes were "unsurprising" because "[B]lack people are lazy and do not work hard." *Id.* ¶ 65. In Wheeler's presence, Minucci frequently complained that Cliff Brown, a Black PST employee, always took a personal day to observe Martin Luther King Day. *Id.* ¶ 76. On one such occasion, Minucci added that Brown should not have been permitted to use Martin Luther King Day as "an excuse to stay home and avoid work," and stated that he, being Italian, should take Columbus Day off. *Id.* Wheeler reported these comments to Mitchell in human resources. Mitchell stated that she resolved the situation by "follow[ing] up to ensure that no employees were negatively impacted in taking that day off." Clark Decl., Ex. 4 ("Mitchell Dep.") at 6.

Third, Wheeler recounts an incident on November 6, 2019 in which Larry Koodin, a manager at the Orangeburg Facility, yelled and cursed at Wheeler on the warehouse floor after Wheeler expressed frustration with duties Koodin had assigned him. *See* Wheeler Decl. ¶ 79; *id.*, Ex. I at 3. Wheeler states that, because Koodin had a history of participating in racialized commentary in the workplace, this outburst made him especially uncomfortable. *Id.* Wheeler reported this incident to human resources's Mitchell. *Id.*, Ex. I at 3. PST states that Mitchell investigated the incident and spoke to Koodin about it. Def. 56.1 ¶ 93. However, Wheeler states PST did not take any concrete action in response to the incident. Wheeler Decl. ¶¶ 80–81.

Koodin "did not treat the white employees at the Orangeburg Facility in a similar, disrespectful manner." *Id.* ¶ 79.

Fourth, Wheeler states that Shane Nelson, a white male PST employee working in the precious metals vault, on multiple occasions approached Wheeler when his work took him to the precious metals vault and asked, "why are you here—to hold the place up?" *Id.* ¶ 70. While making these comments, Nelson held his hands in the air as if he were being robbed. *Id.* Wheeler states that he became so frustrated by these repeated incidents that he photographed Nelson and colleague Gene Boo in the precious metals vault putting their hands in the air and facing him. *See id.*, Ex. H. In this photograph, Nelson and Boo appear smiling and looking at the camera with their hands in the air. *See id.* Nelson, Wheeler states, did not make similar jokes involving white employees. *Id.* ¶ 72.

Fifth, Wheeler describes an incident in which a Hispanic employee, Alex Carranza, was terminated after he left precious metals on the loading dock overnight in violation of company protocol. *Id.* ¶ 82. When precious metals were later left out again, this time over a weekend after Carranza's termination, PST first investigated Wheeler and another Black employee, but, when it came to light that Minucci was at fault, did not take disciplinary action. *Id.* ¶ 83.

### 3.    Wheeler's Leave at PST

PST maintains an employee handbook (the "Employee Handbook") that sets out the notice and certification requirements under the Family and Medical Leave Act ("FMLA") for taking a leave of absence. JSF ¶ 6. The Employee Handbook states:

> Absent unusual circumstances, failure to comply with these notice and certification requirements may result in a delay or denial of the leave. If an employee fails to return to work at the expiration of his or her leave and has not obtained an extension of the leave, the Company may presume that the employee does not plan to return to work an has voluntarily terminated employment with the Company.

*Id.* PST likewise maintains a Short Term Disability ("STD") Plan. *Id.* ¶ 7. The plan states:

> To be eligible for benefits . . . [y]ou must follow all of the procedures set forth
> below in the section entitled Process for Filing a Claim, including all time periods
> for calling the Claims Administrator, completing and returning your Authorization
> for Release of Medical Information, completing and returning your agreement to
> repay overpayments form and having your doctor provide medical proof of
> Disability to the Claims Administrator.

*Id.* The plan further states that "[i]f these procedures are not followed in a timely manner . . .

you will not be eligible for benefits. . . .  In addition, your absence may be considered

unauthorized and you may therefore be subject to disciplinary action up to and including

termination." *Id.* ¶ 8.  In addition, under the plan, benefits end if an employee "fail[s] to comply

with any notification, verification, and/or approval processes required under, or related to, this

plan." *Id.* ¶ 9.

Through approximately May 2020, Aetna was PST's third-party leave administrator.

JSF ¶ 25.  Thereafter, The Hartford Financial Services Group, Inc. ("The Hartford"), purchased

Aetna's leave administration business, and took over as PST's leave administrator.  *Id.*  Wheeler

applied for and was granted STD leave by Aetna from May 26 through July 12, 2015.  *Id.* ¶ 26.

He then returned to work without incident.

Wheeler states that on March 18, 2020, he noticed his left foot was swollen.  Wheeler

Decl. ¶ 88.  As a result, Wheeler took a sick day on March 19, 2020.  *Id.* ¶ 89.  The next week,

Wheeler took a previously approved vacation; thus, his reason for not being at work was

unrelated to his foot injury.  *Id.* ¶ 90.  During his scheduled time off, Wheeler's foot condition

worsened, leading Wheeler to consult with a podiatrist who initially misdiagnosed Wheeler with

gout.  *See id.* ¶¶ 91–92.  When treatment based on this diagnosis did not work, Wheeler returned

to the podiatrist in late March, and an X-ray found he had fractured his foot, requiring surgery.

*Id.* ¶ 92.  Wheeler's doctor advised him he would not be able to return to work at PST until he

had the surgery because his job required him to wear steel-toed boots and be on his feet for most of the day. *Id.* ¶ 93.

Wheeler's injury coincided with the start of the COVID-19 pandemic. *Id.* ¶ 88. New York Governor Andrew Cuomo had issued Executive Order 202.10, which directed hospitals and surgery centers to cancel non-emergency surgeries to increase bed capacity for COVID-19 patients. *Id.* ¶ 94. Wheeler was thus unable to schedule his surgery with haste. Wheeler informed Mitchell in human resources and applied for and was approved for both FMLA and STD leave. *Id.* ¶ 96; JSF ¶ 27. As to FMLA leave, Aetna approved Wheeler for leave from March 26 to April 26, 2020. Def. 56.1 ¶ 43. Wheeler's STD leave was also initially approved until April 26, 2020. *Id.* ¶ 44. To substantiate his continued eligibility for STD and FMLA leave, Wheeler was required to submit additional documentation demonstrating his inability to work after April 26, 2020. Mitchell Decl. ¶ 20.

On April 28, 2020, Aetna sent a letter to Wheeler's then-current address at 10 Sampson Terrace, Danbury, Connecticut ("Connecticut Address") directing Wheeler to complete a Leave of Absence Certification and return it to Aetna by May 13, 2020 to avoid having his claim for further leave and benefits denied. JSF ¶ 29; Mitchell Decl., Ex. 3. That letter stated that if Wheeler were approved, his certification would be backdated such that leave would start on April 27, 2020. Mitchell Decl., Ex. 3.

On May 14, 2020, Aetna sent another letter to the Connecticut Address, stating that Wheeler's claim for further leave and benefits had been denied because Aetna had not received the completed leave certification form as requested in the April 28 letter. JSF ¶ 30; Wheeler Decl., Ex. K. Wheeler states that, at some point thereafter, he provided the required documentation. Wheeler Decl. ¶ 103.

10

On May 26, 2020, PST sent Wheeler a letter to his Connecticut Address stating that (1) Wheeler had been absent from work since March 26, 2020, (2) he had exhausted the available benefits under PST's STD program on April 24, 2020,[4] (3) PST had been advised that Wheeler's request for leave under the FMLA had been denied due to insufficient documentation, and (4) as an "accommodation," PST had placed Wheeler on "temporary unpaid personal leave" beginning on April 27, 2020 and that he remained on unpaid leave through the date of the letter.  Mitchell Decl., Ex. 4.  This letter notified Wheeler that, for PST to continue accommodating his absence from work, he needed to contact Aetna to open an accommodation request no later than June 1, 2020, and provide Aetna with supporting medical documentation.  *Id.*  The letter concluded that "[u]nder the circumstances, should [Wheeler] fail to meet the deadline discussed above or fail to contact [PST] by [June 1, 2020], [Wheeler would] be deemed to have voluntarily resigned [his] Praxair employment."  *Id.*  Wheeler states that, after receiving this letter, he timely contacted PST and provided the requested documentation.  Wheeler Decl. ¶ 105.

On June 1, 2020, The Hartford[5] sent a letter to Wheeler's Connecticut Address confirming that his leave period had been both backdated and extended, so as to run from April 27 to June 8, 2020.  *See* Mitchell Decl., Ex. 5.  The letter set out several potential paths forward, and instructed Wheeler to stay in touch with PST and The Hartford and to contact The Hartford if he needed an extension of his leave.  *Id.*  Alternatively, in the event Wheeler was ready to resume working, the letter stated that Wheeler would need a return-to-work release from his doctor and to submit it to PST.  *Id.*  Also on June 1, 2020, The Hartford sent Wheeler at his Connecticut Address a "Notice of Total or Partial Rejection of Claim for Disability Benefits,"

---

[4] The record elsewhere suggests that Wheeler's STD leave was initially approved through April 26, 2020.  *See* Def. 56.1 ¶ 44.  This discrepancy has no bearing on the pending motion.
[5] The Hartford by this point had replaced Aetna as PST's third party leave administrator.

11

which stated that payment of benefits had been rejected for after June 8, 2020, as that was the date on which Wheeler, based on the medical evidence then on file, was ready to resume work. Mitchell Decl., Ex. 6, at 3. However, the letter stated, if Wheeler were still disabled after June 8, 2020, he should "submit additional medical evidence immediately." *Id.*

In early June 2020, PST contacted Wheeler while he was on leave to request that he return to work to train a new employee. JSF ¶ 36. PST asked if Wheeler's doctor would give him permission to temporarily return to work to conduct the training. *See* Wheeler Dep. at 151– 52. Wheeler appears to have discussed the possibility of making arrangements, *see* Mitchell Decl., Ex. 8 at 2, but ultimately declined because he was still injured, and did not obtain permission from his doctor or return to work to train the new employee. Wheeler Decl. ¶ 111; Def. 56.1 ¶ 60. Wheeler states, that to this point during his leave, he had been in consistent contact with Mitchell over phone and email, and that Mitchell would contact him when there was an issue with his leave documentation or when he had missed a deadline. Wheeler Decl. ¶ 107. However, Wheeler states, after he refused to come in to train the new employee, Mitchell ceased these communications. *Id.* ¶ 112.

On June 12, 2020, The Hartford sent another letter to Wheeler's Connecticut Address noting that it needed additional information to extend Wheeler's leave and asking Wheeler to submit a completed leave certification form by June 27, 2020. JSF ¶ 37; Mitchell Decl., Ex. 9. On June 19, 2020, Wheeler informed PST by email to the employee services account that he had relocated to a former home at 4069 Grace Avenue, Bronx, New York (the "New York Address"). JSF ¶ 38; Wheeler Decl., Ex. L. A representative from the employee services department sent Wheeler an email acknowledging this change in address. Wheeler Decl., Ex. L.

On June 23, 2020, four days after Wheeler had informed PST about his address change, The Hartford sent a letter to Wheeler's Connecticut Address (where he no longer resided) stating that Wheeler's FMLA leave had "run out," "mean[ing] [Wheeler's] job [was] no longer protected" under the FMLA. Mitchell Decl., Ex. 10. The letter instructed Wheeler to speak with his employer if he was still unable to return to work. *Id.* The same day, The Hartford sent a "Notice of Total or Partial Rejection of Claim for Disability Benefits" to Wheeler's Connecticut Address, stating that his STD benefits would expire on July 3, 2020. Mitchell Decl., Ex. 11. The notice stated that payment of benefits was not approved after July 5, 2020 because the medical evidence on file suggested that was the date on which Wheeler could return to work. *Id.* This notice again directed Wheeler to submit additional medical evidence "immediately" if he was still disabled after July 5th. *Id.* It is unclear if and when Wheeler received either of these letters. There is no evidence that, in response, Wheeler contacted either PST or The Hartford to discuss his leave or provide additional medical evidence.

On July 22, 2020, PST sent Wheeler a letter to his Connecticut Address (not his then-current New York Address) stating that The Hartford had informed him that Wheeler's STD and FMLA leave had been exhausted and that claims for further benefits were denied on account of inadequate paperwork. Mitchell Decl., Ex. 12. The letter stated that Wheeler had been put on temporary unpaid personal leave, and was to contact Mitchell no later than July 27, 2020 to arrange for a return to work. *Id.* Should Wheeler fail to do so, the letter stated, he would be "deemed to have voluntarily resigned from employment with Praxair." *Id.* Finally, the letter stated, if Wheeler still could not return to work on account of a disability, he was to contact The Hartford. *See id.* Wheeler states that he did not receive this letter until after July 27, because he

13

was living at the New York Address and renting out the Connecticut address.  Wheeler Decl.
¶ 120.

On July 22, 2020, The Hartford sent Wheeler a letter to his New York address noting
the need for additional information from his healthcare provider so that it could make a decision
on his outstanding claim.  *Id.*, Ex. K.  Wheeler timely received this letter, but did not contact
either The Hartford or PST before July 27, 2020.  Def. 56.1 ¶ 74.  Wheeler states that the letter
gave him the impression that his leave status was still under consideration such that his
employment was not at risk.  Wheeler Decl. ¶ 122.

On July 27, 2020, PST deemed Wheeler to have voluntarily resigned his position.
Mitchell Decl., Ex. 12.  Wheeler states that he learned of this on July 29, 2020 when he
contacted The Hartford to determine the status of his claims and how to continue receiving STD
benefits, and The Hartford informed him that his employment with PST had been terminated.
Wheeler Decl. ¶¶ 123–24.  PST states that Wheeler did not contact The Hartford until some time
in August 2020.  Def. 56.1 ¶ 76.  Wheeler, however, states that, after learning on July 29, 2020
from The Hartford of his termination, he "immediately" contacted Mitchell and told her he had
never received notice that his employment was at risk, Wheeler Decl. ¶ 125–26, and that he
believed he had submitted all necessary documentation, *id.* ¶¶ 127–30.  Wheeler states that
Mitchell responded that she would contact "corporate" and get back to him, but that, when
Wheeler followed up several days later, Mitchell told him corporate's position was that nothing
could be done to reverse the termination.  *Id.* ¶¶ 131–33.  Wheeler states that Mitchell refused to
provide him with a copy of the July 20, 2020 letter sent to the Connecticut Address.  *Id.* ¶ 134.

**B.    Procedural History**

On February 9, 2021, Wheeler filed the Complaint.  Dkt. 1.  On August 30, 2022, after
discovery, PST filed a motion for summary judgment on all claims, Dkt. 48, and a supporting

memorandum of law, Dkt. 49 ("Def. Br."). On October 11, 2022, Wheeler filed his opposition. Dkt. 55 ("Pl. Br."). On November 10, 2022, PST filed a reply. Dkt. 61 ("Def. Reply Br.").

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in deciding whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). But "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in such a case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III. Discussion

Wheeler brings claims of race and disability discrimination under the NYSHRL, including a race-based hostile work environment claim, and retaliation claims under both state law and the FMLA. The Court will address, in sequence, PST's argument that certain claims are untimely, the hostile work environment claim, Wheeler's other surviving discrimination claims, and finally his retaliation claims.

### A. Timeliness

PST argues that Wheeler's failure to promote claims based on conduct predating February 9, 2018 are now time-barred. Def. Br. at 9–10. PST is correct.

Claims for discrimination under the NYSHRL are subject to a three-year statute of limitations. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997). That period begins to run from "the time of the [discrete] discriminatory act." *Chardon v. Fernandez*,

454 U.S. 6, 8 (1981) (emphasis omitted).  As Wheeler filed his complaint in this Court on February 9, 2021, for his failure to promote claims to be timely, they must be based on conduct on or after February 9, 2018.

That is not the case for a subset of Wheeler's discrimination claims.  Wheeler alleges that every year from 2014 onward, at the time of his performance review, he sought a promotion, raise, and/or title change.  *See* Wheeler Decl. ¶ 43.  He claims that PST's failure to promote or fairly compensate him on each of these discrete occasions constitutes an adverse employment action supporting a claim of discrimination.  *See* Pl. Br. at 12.  Wheeler emphasizes the instance when PST "created a new position—Warehouse Coordinator—instead of giving Wheeler the title of the job he was actually performing, Warehouse Lead[.]" *Id.*  That, however, undisputedly occurred in 2017.  JSF ¶ 24.

To the extent Wheeler's claims of failures to promote or compensate are based on conduct before February 9, 2018, such claims are therefore time-barred.  That includes the claims based on Wheeler's requests for promotions and raises between 2014 and 2017, and his challenge to the Warehouse Coordinator title change.  As to Wheeler's 2018 performance review, the date of that review, and the later date when a promotion or commensurate raise was denied, the record as presented by the parties does not make clear the dates of such events.  *See* Wheeler Decl. ¶ 43.  The Court therefore will sustain these claims, pending clarification whether these events occurred before February 9, 2018.  *See Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 310 (2d. Cir. 2020) (in deciding summary judgment motion based on asserted untimeliness, resolving ambiguity as to timing of certain events in plaintiff's favor).

Although acknowledging that various allegedly discriminatory acts occurred outside the limitations period, Wheeler seeks to sustain his challenges to these based on the continuing

violation doctrine—an "exception to the normal [rules governing] accrual[.]" *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999); *see also* Wheeler Br. at 4–5. "The continuing violation doctrine 'applies to claims composed of a series of separate acts that collectively constitute one unlawful practice,' and functions to 'delay the commencement of the statute of limitations period until the last discriminatory act in further of' that broader unlawful practice[.]" *Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) (first quoting *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015), then quoting *Harris*, 186 F.3d at 248) (internal citations omitted). The exception does not apply, however, to "'discrete acts of discrimination or retaliation that occurred outside the statutory time period,' even if other acts of discrimination occurred within the statutory time period." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). Such discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire," among others. *Morgan*, 536 U.S. at 114. For the continuing violation to apply, the plaintiff instead must have "experienced a continuous practice and policy of discrimination," *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks omitted), or "a series of separate acts that collectively constitute one 'unlawful employment practice,'" *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).

Wheeler casts PST's refusals to promote him, give him a raise, or adjust his title to cover the duties he took on as a "continuous practice and policy of discrimination[.]" *Fitzgerald*, 251 F.3d at 359. But prevailing law does not permit Wheeler to stitch together these discrete acts. *See, e.g., Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) (failure to promote claims cannot be brought within statutory limitations period via continuing violation doctrine, "even when undertaken pursuant to a general policy that results in other discrete acts occurring

within the limitations period"); *Allen v. N.Y.C. Dep't of Env't. Prot.*, 51 F. Supp. 3d 504, 510

(S.D.N.Y. 2014) (failure to promote claims cannot together form continuing violation even when

"same employee has been repeatedly denied a position"); *Rowe v. N.Y. State Dep't of Tax'n and

Fin.*, 786 F. App'x 302, 304–05 (2d Cir. 2019) (allegations of multiple failures to promote did

not revive time-barred instances under continuing violation doctrine). Wheeler alleges a series

of separate, discriminatory acts, each of which was knowable and inherently actionable at the

time it was committed. The continuing violation doctrine does not rescue these claims from

untimeliness.

PST has not directed its claim of untimeliness to Wheeler's hostile work environment

claims. *See* Def. Br. at 9–10. For avoidance of doubt, this claim is timely. In contrast to claims

of failures to promote or compensate, a hostile work environment claim is a paradigmatic

"continuing violation." *See Morgan*, 536 U.S. at 115–17. As the Supreme Court has explained:

> Hostile environment claims are different in kind from discrete acts. Their very
> nature involves repeated conduct. The 'unlawful employment practice' therefore
> cannot be said to occur on any particular day. It occurs over a series of days or
> perhaps years and, in direct contrast to discrete acts, a single act of harassment may
> not be actionable on its own.

*Id.* at 115 (internal citations omitted). Provided the hostile work environment claim

encompasses at least one act within the limitations period, the acts predating the limitations

period are properly considered as part of the claim. *See McGullam v. Cedar Graphics, Inc.*, 609

F.3d 70, 75–76 (2d Cir. 2010).

Such is the case here. To be sure, a number of Wheeler's claims of racist or racially

hostile statements and actions are not anchored in time. Even as to those he casts as recurrent, he

does not specifically allege an occurrence of these on or after February 9, 2018. *See* Wheeler

Decl. ¶¶ 65–83. Nonetheless, Wheeler is sufficiently concrete about one such act: that in which

Koodin allegedly screamed at him on the warehouse floor on account of Wheeler's race, an event

Wheeler attests occurred in November 2019. *See* Wheeler Decl. ¶ 79. That act makes Wheeler's

hostile work environment claim timely under the continuing violation doctrine. *See McGullam*,

609 F.3d at 75–76.

The Court accordingly grants summary judgment to PST based on Wheeler's claims of

discrimination, including those alleging failures to promote and compensate, based on actions

and omissions before February 9, 2018. The Court otherwise denies summary judgment to PST

based on this argument, and thus—subject to PST's other arguments for summary judgment—

sustains Wheeler's hostile work environment claim, and his discrimination and retaliation claims

based on events after that date, including his claims challenging his termination in 2020.

## B.      Hostile Work Environment Under NYSHRL

PST next moves for summary judgment against Wheeler's hostile work environment

claim under the NYSHRL, which alleges that, over the course of his employment, he was

subjected to harassment on account of his race.

### 1.      Applicable Legal Standards

Until recently, hostile work environment claims under the NYSHRL were governed by

the same standard as federal law claims brought under Title VII. *See Summa v. Hofstra Univ.*,

708 F.3d 115, 123–24 (2d Cir. 2013). To prevail on a NYSHRL hostile work environment

claim, a plaintiff was therefore required to establish "[1] that the harassment was sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment, and [2] that a specific basis exist[ed] for imputing the objectionable

conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal

quotation marks and citations omitted). The demands of this standard resulted, in many cases, in

the dismissal of, or the entry of summary judgment against, claims of race-based hostile work environments. *See* p. 8, *infra* (collecting cases).

Effective October 11, 2019, however, amendments to the NYSHRL broadened its reach. The NYSHRL now requires a plaintiff to establish that he was subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more . . . protected categories." N.Y. Exec. Law. §§ 296(1)(h), 300; *see Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ. 02512 (CM), 2022 WL 524551, at *9 (S.D.N.Y. Feb. 22, 2022). This more lenient standard brings state law closer to the standard to establish a hostile work environment claim under the New York City Human Rights Law ("NYCHRL"), under which a plaintiff need only show that he was treated "less well than other employees" because of their protected class. *See Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

The case law, however, has yet to definitively resolve whether the NYSHRL's liability standard is now coextensive with that of the NYCHRL, or whether it requires more, so as to impose a standard between federal and city law. *See Yost v. Everyrealm. Inc.,* No. 22 Civ. 6549 (PAE), 2023 WL 2224450, at *11 (S.D.N.Y. Feb. 24, 2023). *Compare Arazi v. Cohen Bros. Really Corp.*, No. 20 Civ. 8837 (GHW), 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) ("After that amendment, the standard for NYSHRL aligns with the NYCHRL standard for claims that accrued on or after October 11, 2019."), *with Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) (amendment brings NYSHRL "closer to" NYCHRL standard). The briefs in this case do not meaningfully engage with this issue. Wheeler asserts without elaboration that the NYSHRL as amended imposes the

same hostile work environment standard as that of the NYCHRL, Pl. Br. at 7; PST largely

ignores the amendments, save to note that the events on which Wheeler relies mostly predate the

2019 amendment and to argue that the limited events thereafter cannot establish liability even

under the NYCHRL standard, Def. Reply Br. at 7–8, 8 n.12.

The Court will assume *arguendo*, for purposes of this motion, that the amended

NYSHRL tracks the NYCHRL, without prejudice to PST's right to later attempt to demonstrate

that NYSHRL sets a more rigorous standard.  Critically, however, as is undisputed, the amended

NYSHRL does not have retroactive effect.  *See Wellner*, 2019 WL 4081898, at *5 n.4

(amendments do not apply to conduct predating effective date).  Thus, for a plaintiff whose claim

is based on conduct before October 11, 2019, the Title VII standard still applies.

The Court therefore first considers whether the evidence as to the work environment that

Wheeler had confronted at PST, as of October 11, 2019, is sufficient to support a hostile work

environment claim under the Title VII standard.  If not, summary judgment must be entered for

PST on Wheeler's hostile work environment claim based on conduct up to that date, and the

Court will then examine whether the evidence of workplace conduct after the amendment,

viewed in nonmovant Wheeler's favor, is sufficient to satisfy the lower NYCHRL standard.

In making this assessment, the Court has found the record evidence challenging.  As to

many of Wheeler's allegations of racist or racially tinged statements, Wheeler did not situate

these in time, merely stating that such statements were recurrent.  *See, e.g.*, Wheeler Decl. ¶ 65

(Minucci's comments concerning Black people being lazy were "not made once, but, rather, on

multiple occasions throughout [Wheeler's] employment at PST"); *id.* ¶ 66 (Gibson "routinely

expressed" his belief that "[B]lack people should feel lucky to have any job at all" to Wheeler

and other employees); *id.* ¶¶ 70–71 (Shane Nelson, in what was "not an isolated incident, but,

22

rather took place with regularity" would pretend he was being robbed when Wheeler entered

precious metals vault); *id.* ¶ 76 (Minucci "frequently" complained when Brown, a Black

employee, took MLK day off).  And in deposing Wheeler, defense counsel did not pin down the

dates of these statements, including whether they post-dated the amendment.  To be sure, as to

one incident, that in which Gibson told Wheeler his name was that of a slave, *see id.* ¶ 67, based

on Wheeler's account, it necessarily occurred before October 11, 2019.[6]  But the balance of

Wheeler's allegations, as recounted above, are largely of endemic or routinely made derogatory

comments about himself or other persons on account of their being Black.  In the interest of

caution, the Court, for the purposes of this motion, treats each such comment as having been

made both before, and after, the date of the amendment.[7]

> ### 2.    Workplace Conduct Before October 11, 2019

Viewing the evidence together and in the light most favorable to Wheeler, the conduct on

which he bases his hostile work environment claim during the period before October 11, 2019

falls far short of satisfying the then-applicable Title VII standard.  This conduct consists of the

---

[6] Wheeler testified that Gibson had returned from a summer vacation in which he had had occasion to learn about enslaved people, and saw Wheeler's last name on a list of enslaved people.  Wheeler Dep. at 176–77.  Although Wheeler did not recall the date of this statement, he placed it as occurring upon Gibson's return from a summer vacation, *id.* at 177.  Because the amendment took effect in mid-autumn 2019, and because Wheeler took leave from PST in early spring 2020, the comment necessarily predated the amendment.

[7] To be sure, as PST points out, because Wheeler went on leave in late March 2020, he spent only about five months in the workplace after the effective date of the amendment to the NYSHRL.  It is nonetheless reasonable to infer, based on Wheeler's accounts of statements as recurrent, *see* Wheeler Decl. ¶¶ 65–76, that such were made during this time window.  Insofar as Wheeler alleges that Minucci commented "every year" about Black employees taking MLK Day off, Wheeler Dep. at 172, that comment is particularly fairly inferred to have been made in the vicinity of that holiday in January 2020. *See Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) (on summary judgment, leaving for jury to decide credibility and incidence of occurrence of plaintiffs' claims of "constant" harassment).

comment that manager Gibson once made about Wheeler having a "slave name"; the recurrent

comments that Gibson and supervisor Minucci made to the effect that Black people are lazy;

Minucci's recurrent complaint that Black people take the Martin Luther King holiday off;

manager Koodin's having once yelled at Wheeler in a manner in which he did not treat white

employees; employee Nelson's query whether Wheeler had come to the vault "to hold the place

up"; and the fact that PST investigated Wheeler and another Black employee for leaving the

precious metals vault open while not punishing the white employee, Minucci, who proved to be

responsible.  As distressing as such incidents would have been, this assembled conduct falls well

short of the demanding Title VII standard as illuminated by cases dismissing claims based on

comparable or more serious racialized commentary.  *See, e.g.*, *Fletcher v. ABM Bldg. Value*, 775

F. App'x 8, 13 (2d Cir. 2019) (dismissing hostile work environment claim under severe and

pervasive standard despite "repeated racist and sexist slurs" made against plaintiff); *Berrie v. Bd.

of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 48 (2d Cir. 2018) (eleven

specific racially motivated incidents involving "racially offensive remarks" over six-year period

insufficient to make out Title VII claim); *Stembridge v. City of New York*, 88 F. Supp. 2d 276,

286 (S.D.N.Y. 2000) (seven specific instances of racialized comments over three year period,

including use of the n-word, insufficient to support Title VII claim); *Carter v. Cornell Univ.*, 976

F. Supp. 224, 228–29 (S.D.N.Y. 1997) (string of racially charged comments made by supervisor

over the years, including statement that "Rodney King would not have been beaten had he not

run from the police" and that "Rev. Martin Luther King, Jr. [did not] deserve[] a national

holiday," insufficient to support Title VII claim).  Wheeler's claim of discriminatory pay

practices does not rescue these claims.[8]  To the extent Wheeler brings a hostile work environment claim based on workplace conduct before October 11, 2019, the Court grants summary judgment to PST on this claim.

### 3.    Workplace Conduct On or After October 11, 2019

In contrast, assuming that occurrences of the recurrent racially tinged commentary to which Wheeler has testified occurred between October 11, 2019 and the start of his leave in spring 2020, Wheeler's hostile work environment claim based on post-amendment workplace conduct survives summary judgment under the more permissible NYCHRL standard which the Court has assumed to govern post-amendment NYSHRL claims.  Under that standard, a plaintiff must establish that he was "treated less well than other employees because of [his] [race]," *Mihalik*, 715 F.3d at 110, although "petty slights or trivial inconveniences . . . are not actionable," *Williams*, 872 N.Y.S.2d at 41.

The persistent derogatory comments about Black people made in Wheeler's presence by multiple PST personnel, including managers and Wheeler's team leader, clear this bar.  Wheeler alleges that several colleagues consistently made derogatory comments about Black people throughout his tenure.  These include, as noted, manager Gibson's "routine" comments that Black people "should feel lucky to have any job at all," Wheeler Decl. ¶ 66, team lead Minucci's statements that it was "unsurprising" that Black employees had been terminated or passed over for advancement because "[B]lack people are lazy and do not work hard," *id.*, Minucci's annual disparagement of a Black employee for taking MLK Day off, *id.* ¶ 76, and co-worker Nelson's comment likening Wheeler to an armed vault robber and play-acting being robbed, *id.* ¶¶ 70–73;

---

[8] As explained below, Wheeler's claim of a race-based pay disparity is not supported by the evidence. *See* pp. 35–36, *infra*.  In any event, the fact of such a disparity would not push the assembled evidence over the "severe and pervasive" line. *See Berrie*, 750 F. App'x at 48.

*id.*, Ex. H.  Considering these incidents in combination, a reasonable jury could find that white employees were not subject to similar aspersions, and that Wheeler was thus treated "less well" because of his race. *See Williams*, 872 N.Y.S.2d at 39.  That is so for several reasons.

First, much of the commentary at issue overtly referenced race. *Cf. Lennert-Gonzalez v. Delta Airlines, Inc.*, No. 11 Civ. 1459 (JMF), 2013 WL 754710, at *8 (Feb. 28, 2013) (NYCHRL hostile environment claim failed where plaintiff could not connect hostile conduct to national origin); *Rozenfeld v. Dep't of Design & Const. of City of N.Y.*, 875 F. Supp. 2d 189, 209 (E.D.N.Y. 2012) (plaintiff failed to draw connection between derogatory comment and protected class); *Marseille v. Mount Sinai Health Sys., Inc.*, No. 18 Civ. 12136 (VEC), 2021 WL 3475620, at *11 (S.D.N.Y. Aug. 5, 2021), *aff'd sub nom. Marseille v. Mount Sinai Hosp.*, No. 21-2140, 2022 WL 14700981 (2d Cir. Oct. 26, 2022) (plaintiff had not raised triable question of fact on hostile work environment claim under NYCHRL absent evidence linking conduct to protected characteristics).  Here, by contrast, most of the conduct Wheeler describes was overtly racial in nature. *Mihalik*, 715 F.3d at 110.

Second, multiple persons, including managers, expressed these views, and did so repeatedly, so as to permit a jury crediting Wheeler's account to find it indicative of workplace culture.  Under the NYCHRL standard, "even a single comment may be actionable in the proper context." *Mihalik*, 715 F.3d at 113 (citing *Williams*, 872 N.Y.S.2d at 41 & n.30); *see also Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012) (denying summary judgment to employer under NYCHRL despite "isolated" nature of inappropriate comments because these "foster[ed] an office environment that degraded women"); *Modica v. N.Y.C. Dep't of Educ.*, No. 20 Civ. 4834 (JMF), 2021 WL 3408587, at *7 (S.D.N.Y. Aug. 4, 2021) (finding allegation that employee ridiculed plaintiff at meeting based on her disability stated plausible hostile work

environment claim under post-amendment NYSHRL); *Sanderson v. Leg Apparel LLC*, No. 19 Civ. 8423 (GHW), 2020 WL 7342742, at *8 (S.D.N.Y. Dec. 14, 2020) (holding three comments about plaintiff's perceived sexual orientation sufficient to allege that plaintiff had been treated "less well" on basis of protected class).

Third, the offending commentary demeans PST's Black employees as unworthy of the workplace on account of race. *See Williams*, 872 N.Y.S.2d at 41 n.30 ("One can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and be actionable"); *see also, e.g.*, *Golston-Green v. City of N.Y.*, 123 N.Y.S.3d 656, 671 (2d Dep't 2020) (NYCHRL hostile work environment claim survived summary judgment in part because supervisor's comment that he did not "like women on this job because they have babies" expressed a view of the role of women in the workplace).

The Court accordingly denies PST's summary judgment motion, to the extent directed at Wheeler's hostile work environment claim based on conduct post-dating the October 11, 2019 amendment of the NYSHRL. A jury crediting Wheeler's account could find the pattern of racialized derogatory remarks made to him and in his presence concerning "the role of [Black people] in the workplace," *Williams*, 872 N.Y.S.2d at 41 n.30, to have resulted in Wheeler's being treated "less well" on account of his race.[9]

---

[9] The Court does not have occasion here to consider whether evidence of racialized workplace conduct at PST predating the NYSHRL amendment may nevertheless be admissible at trial on Wheeler's hostile work environment claim based on post-amendment conduct. Wheeler is at liberty to move *in limine* for leave to offer such evidence.

C.      **Discrimination Claims Under NYSHRL**

Wheeler brings three types of discrimination claims under the NYSHRL: (1) a failure to promote claim based on race; (2) a failure to fairly compensate claim based on race; and (3) termination based on race and/or disability.

1.      **Applicable Legal Standards**

Under the NYSHRL, it is "an unlawful discriminatory practice" for an employer, based on an individual's race, color, or sex, "to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).  NYSHRL discrimination claims are governed by the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015).[10]  Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Holcomb*, 521 F.3d at 138.  To do so, the plaintiff must show that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138).  In employment discrimination cases, the burden of establishing a *prima facie* case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).  However, a plaintiff cannot establish a *prima facie* case based on "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

---

[10] Neither party has argued that the 2019 amendments to the NYSHRL alter the application of the *McDonnell Douglas* framework to discrete discrimination claims.

Where the plaintiff can demonstrate a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)). At that point, the burden of production shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (employer's burden is "one of production, not persuasion").

If the employer satisfies that burden, the presumption of discriminatory intent drops away, and "the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Lenzi*, 944 F.3d at 107 (citation omitted); *see also Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996). The plaintiff, however, is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the decision. *Holcomb*, 521 F.3d at 138 (citation omitted).

### 2.    Failure to Promote Claim

Wheeler's failure to promote claim alleges that each time PST did not promote him after his annual performance review, it discriminated against him based on his race. *See* Wheeler Br. at 4–5, 12.

#### a.    Prima facie *case*

PST does not dispute the first two elements of Wheeler's *prima facie* case: that, as a Black man, he belonged to a protected class, and that he qualified for a promotion. *See* Def. Br. at 12. Rather, PST argues that (1) because it never had a job opening to fill, Wheeler did not

experience an adverse employment action when he was not promoted, and (2) even if Wheeler's

non-promotion could be found an adverse action, the evidence adduced does not give rise to an

inference of racial discrimination. *Id.* at 10–13.

i.      Adverse employment action

Passing over an employee for a promotion is a paradigmatic adverse employment action

under the *McDonnell Douglas* framework. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742,

761 (1998) (listing examples of adverse employment actions as hiring, firing, and failing to

promote).  To make out a *prima facie* failure to promote claim, a plaintiff typically must "allege

that she or he applied for a specific position or positions and was rejected therefrom, rather than

merely asserting that on several occasions she or he generally requested promotion." *Brown v.

Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998).  That rule is "subject to modification

where the facts of a particular case make an allegation of a specific application a quixotic

requirement." *Id.*  But to pursue a failure to promote claim in the absence of an application to an

open position, a plaintiff must show "that (1) the vacancy at issue was not posted, and (2) the

employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to

apply for it through informal procedures endorsed by the employer." *Petrosino v. Bell Atl.*, 385

F.3d 210, 227 (2d Cir. 2004).

Wheeler has adduced sufficient evidence to come within this exception to the general

rule.  PST notes the lack of evidence that, at the relevant times, PST had an official job posting

for a Warehouse Lead or a Warehouse Coordinator position. Def. Br. at 14.  But Wheeler's

failure to promote claim is that he was in fact performing the duties previously discharged by

Benson, the retired Warehouse Lead, and that PST never adjusted his official title to reflect this

reality. *See* Wheeler Decl., Ex. F (email from Wheeler to Peterhoff, asking: "Why is my title

Material Handler, yet I have been performing duties outside of this job scope?"). In these circumstances, where Wheeler's contention is that PST took advantage of his presence and qualifications to carry out Benson's Warehouse Lead job and therefore did not post it, a jury could find the requirement of a job application to be "quixotic." *Brown*, 163 F.3d at 710.

The evidence also supports that, notwithstanding that "the vacancy at issue was not posted," Wheeler "attempted to apply for it through informal procedures endorsed by the employer," *Petrosino*, 385 F.3d at 227. Wheeler has presented competent evidence that he was in practice filling the role of Warehouse Lead in Warehouse 560, and had been endorsed for that post by supervisor Minucci. *See, e.g.,* Wheeler Decl., Ex. D (in recommending Wheeler for a promotion, Minucci wrote: "I want to have [Wheeler] move over to the 560 building and run the warehouse where Dennis [Benson] is currently."). Wheeler has also produced evidence—in the form of emails among human resources and his then-supervisor, Peterhoff—that, in the PST environment, requesting a promotion during a yearly performance review was a viable means to seek promotion. *See* Wheeler Decl., Ex. F.

Thus, Wheeler has amassed sufficient evidence that PST's failure to promote him to the position Warehouse Lead, upon his requests for promotion at his yearly review, constituted an adverse employment action.

ii.     Inference of discrimination

Wheeler has not, however, adduced evidence sufficient to support the inference that the decision not to promote him arose from racial discrimination. Given the idiosyncratic nature of many work environments, the proof required to give rise to such an inference "inevitably var[ies] in different employment discrimination cases." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *see Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002).

31

Circumstances supporting this inference may include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action]." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). Where there is no direct evidence of discrimination, a plaintiff may rely on indirect or circumstantial evidence. *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).

Wheeler has adduced evidence on which a jury could find that PST acted exploitatively towards him, in that he took on additional job responsibilities without a commensurate bump in title, tier, or pay. But more is needed to make out a claim of racial discrimination. Fatal here, Wheeler has not come forward with non-speculative evidence that PST's decision not to promote him was based on his being Black. He does not, for example, point to any writings or statements by the decisionmakers indicative of racial bias in hiring and promotions. *See, e.g.*, *Tolbert*, 790 F.3d at 437–38 (plaintiff established *prima facie* case at summary judgment in failure to promote case where discriminatory remarks were made by "de facto decisionmaker" and concerned plaintiff's qualifications in workplace); *Zhang v. Barr Laboratories, Inc.*, No. 98 Civ. 5717 (DC), 2000 WL 565185, at *4–5 (S.D.N.Y. May 8, 2000) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision[.]"). Nor does he point to evidence of a pattern of hiring decisions at PST reflecting a race-based skew. *See, e.g.*, *Taylor v. City of New York*, 207 F. Supp. 3d 293, 304–05 (S.D.N.Y. 2016) (evidence that only two of 370 individuals in desired position were members of plaintiff's protected class helped raise an inference of discrimination); *Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 374

(S.D.N.Y. 2013) (statistical evidence may support discrimination claim); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 291–92 (S.D.N.Y. 2001) (evidence that five oldest people in certain position were let go could allow fact finder to conclude discriminatory motive). And, because the post Wheeler sought was never filled and eventually eliminated, no inference can arise in this case from the promotion of a person outside the protected class. *See, e.g., Terry*, 336 F.3d at 139 (circumstances under which plaintiff was passed over for position gave rise to inference of discrimination where person chosen instead was outside protected class but allegedly less qualified than plaintiff). To the contrary, Wheeler appears to have been chosen— in preference to the rest of the pool of Material Handlers, at least one of whom was white—to train for and take over certain responsibilities of the retired Benson. *See* Wheeler Decl., Ex. D (Minucci Email); JSF ¶¶ 14–16. Wheeler does not adduce evidence why PST, if motivated by racial discrimination, would choose to entrust Wheeler with these added responsibilities.

In attempting to make out a *prima facie* case, Wheeler seizes on the comments above that he attests were made by PST employees about the work habits of Black employees. *See* Pl. Br. at 15. But these generalized comments, as rendered, were not made about Wheeler and were not made in connection with his employment generally or his requests for promotion specifically. Nor does Wheeler situate these derogatory remarks in time, let alone as temporally near any of Wheeler's promotion requests. And, for the most part, the comments on which Wheeler seizes were made by persons (i.e., Gibson and Nelson) not involved in Wheeler's performance reviews or in assessing his eligibility for promotion. *See* Def. 56.1 ¶ 99 (Gibson); *id.* ¶ 109 (Nelson). *See, e.g., Jimenez v. City of New York*, 605 F. Supp. 2d 485, 523 (2009) (improper remarks not significantly probative of employment discrimination when not attributable to a decision-maker or made in context of the employment decision).

33

The one exception is Minucci, who, as noted, Wheeler attests made racial comments, including that it was unsurprising when a Black employee was passed over for promotions. Wheeler Decl. ¶ 65.  Wheeler asserts that, because Minucci had some degree of supervisory authority over him, it is reasonable to assume he had a say in the decisions not to promote him. Pl. Br. at 17.  But, during the period covered by Wheeler's timely failure to promote claims, Minucci was no longer Wheeler's supervisor; it was Peterhoff, to whom Wheeler does not attribute any racial statements or improprieties, and who appears to have tried to advance Wheeler's cause.  *See* Wheeler Decl., Ex. F; *see also* Wheeler Dep. at 45 (identifying Peterhoff as his supervisor starting in at least 2017); Minucci Dep. at 17 (testifying that, at some point during his tenure, PST took supervisory functions from him); *compare* Wheeler Decl., Ex. D (Minucci letter of 2014, recommending Wheeler be promoted to Tier 4), *with id.*, Ex. F (email exchange of June 1, 2016 between Peterhoff and Mitchell concerning potential promotion for Wheeler).  And, earlier, in 2014, in the one example the record reflects of Minucci's involvement in a promotion decision regarding Wheeler, Minucci, praising Wheeler's performance, had recommended him for a two-tier promotion.  *See* Wheeler Decl., Ex. D ("I . . . would like to promote Sean Wheeler from a T2 to a T4. . . . [H]e is very motivated and willing to learn and has the great ability of asking questions.").

Although the evidence is less than pellucid, it suggests that the decision not to promote Wheeler and to eliminate the position previously occupied by Benson was made at a corporate level by persons unidentified.  *See id.*, Ex. F (Peterhoff email to Wheeler of June 1, 2016, stating: "There are some who are working for your job level/title change because they see what you are saying and now it is a process in getting other people to 'buy-in' to that."); *see also id.* (Wheeler message, stating: "Based on our discussion my understanding is that I am not going to get a title

change or pay increase.  As you state, the company does not want to do anything.").  There has

not been any evidence adduced supporting a claim of racial discrimination by these unidentified

higher-ups, in general, or in connection with the decisions not to elevate Wheeler.

The Court accordingly finds that Wheeler has not made out a *prima facie* case of racial

discrimination in connection with his inability to obtain a promotion.  The Court therefore grants

summary judgment to PST on the failure to promote claims.

### 3.      Failure to Fairly Compensate Claim

For much the same reasons, Wheeler fails to make out a *prima facie* case that he was

denied fair compensation based on racial discrimination.  It is undisputed that Wheeler is in a

protected class and was qualified for the position he held.  And a failure to fairly compensate an

employee can constitute an adverse employment action.  *Syeed v. Bloomberg L.P.*, 568 F. Supp.

3d 314, 344 (S.D.N.Y. 2021).  But, as to this claim too, Wheeler has not come forward with

evidence supporting the inference that PST's pay determinations for him arose from racial

discrimination.

Wheeler's sole basis for asserting racial discrimination in pay is based on the higher pay

of three persons he casts as comparators: Benson, Minucci, and Williams.  "Because unequal pay

is a relative concept, the key inquiry is whether the plaintiff has adequate comparators who are

'similarly situated in all material respects.'"  *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp.

3d 99, 118 (S.D.N.Y. 2020) (quoting *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE),

2023 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013)).  The factors comprising "all material

respects" can vary, but a plaintiff "typically must plead comparators' relevant experience and

length of employment in order to raise an inference of discrimination."  *Id.*

Wheeler's three ostensible comparators are far too dissimilar from him to satisfy that

standard.  Minucci and Benson held higher posts than Wheeler.  *See* Def. 56.1 ¶¶ 24 (Minucci:

Lead Customer Site Technician), 27 (Benson: Warehouse Lead). And all three had significantly longer tenures at PST than Wheeler. Williams and Benson had worked at the Orangeburg facility at the time PST acquired it in or around 2000. *Id.* ¶¶ 25–27, 34. Williams, in fact, had worked there for nearly 30 years at the time of the acquisition, *id.* ¶ 34, meaning that, at the time that Wheeler was first hired in 2011, Williams had had nearly forty years of relevant experience, eleven under PST's management, at the facility. *See* JSF ¶ 3. Minucci started in 2003, eight years before Wheeler, who joined PST with minimal experience in material handling. *See* Def. 56.1 ¶ 23; JSF ¶ 3; Wheeler Dep. at 35–36 (describing his past work history at group home and Verizon store). And where a plaintiff claims discriminatory compensation based on a protected characteristic, materially different tenures preclude reliance on a comparator's pay as an indicator of discrimination. *See Humphries*, 2013 WL 6196561, at *6–7. There is particularly good reason for so concluding here. The undisputed evidence is that PST routinely awarded employees modest increases in their pay each year during their tenure. *See* JSF ¶¶ 18, 21, 23 (documenting pay histories reflecting slight raises year-to-year). Persons who had worked for PST for a decade (or more) longer than Wheeler would be expected to have higher salaries than he. Insofar as Wheeler's claim of racially disparate pay turns on the pay of persons who are not fair comparators, Wheeler has not adduced evidence supporting an inference of discrimination, and thus cannot make out a *prima facie* case of racial discrimination in compensation. The Court grants summary judgment to PST on these claims.

### 4.    Termination Claim

Wheeler's final discrimination claim is that, when PST terminated him in July 2020, it did so based on race and disability discrimination. PST counters that the undisputed evidence is that Wheeler was terminated for a legitimate non-discriminatory reason, based on his failure to attend to his medical documentation while on leave; that, on that basis, it deemed Wheeler to

have voluntarily resigned after a period of no communication; and that, in all events, there is insufficient evidence on which a jury could attribute PST's termination to his race or disability. Def. Br. at 10–11, 17.  PST is correct.

Two elements of Wheeler's *prima facie* case are in dispute: whether he was terminated in July 2020, and thus experienced an adverse employment action; and if so, whether the evidence can support the inference that that termination resulted from race or disability discrimination. On the first, a jury could find for Wheeler.  PST relies on cases in which an employee voluntarily resigned and in which the separation was not an adverse action.[11]  It argues that Wheeler's July 2020 separation from PST similarly was not an adverse action.  But although PST's handbook treated employees who did not respond to certain notices as having voluntarily resigned, the evidence would permit a finding that Wheeler, who claimed not to have received the notices, did not in actuality mean to do so.  *See* Wheeler Decl. ¶¶ 126–35.  Wheeler attests that, having moved during the early months of the pandemic, he did not see the notices in time to act on them, *id.* ¶ 120, and that once The Hartford notified him that his employment had ended, *id.* ¶ 124, Wheeler followed up with Mitchell in PST's human resources department, and asked if anything could be done to salvage his employment, *id.* ¶ 126.  Crediting this testimony, a jury could find that Wheeler did not voluntarily cease employment, but instead was terminated by PST based on the inferences it drew from his non-responsiveness to its notices.  Such could be found an adverse employment action.  *See, e.g.*, *Williams v. PMA Companies, Inc.*, 564 F. Supp.

---

[11] *See, e.g., Adams v. Verizon N.Y., Inc.*, No. 04 Civ. 4314 (MGC), 2008 WL 2047815, at * 11 (S.D.N.Y. May 13, 2008) (employee walked off job one day and never came back); *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05 Civ. 6496 (PGG), 2010 WL 1326779, at *10 (S.D.N.Y. Mar. 31, 2010) (plaintiff accepted a job at another workplace and thus voluntarily resigned); *Cadet v. Deutsche Bank Sec. Inc.*, No. 11 Civ. 7964 (CM), 2013 WL 3090690, at *14 (S.D.N.Y. June 18, 2013) (plaintiff submitted voluntary resignation though attempted to rescind).

3d 32, 49 (N.D.N.Y. 2021) (genuine issue of material fact as to whether plaintiff resigned at all precluded summary judgment when jury could find defendant fabricated rumor of plaintiff's resignation which led to plaintiff's ultimate termination).

However, Wheeler has failed to adduce evidence on which a jury could find the final element of a *prima facie* case: that PST's termination of him was based on race or disability. Wheeler's theory is that HR's Mitchell purposefully sent the July 2020 letter to his Connecticut Address at which Wheeler had ceased to reside, preventing Wheeler from receiving notice of his leave status in time to contact PST, and causing PST, per its handbook, to deem him as having voluntarily resigned. *See* Pl. Br. at 15. Wheeler casts this as devious, because Wheeler had communicated his new address to PST, and because Mitchell had been more communicative when Wheeler earlier had been in danger of missing leave-related deadlines. *See* Wheeler Decl. ¶¶ 112–13.

Wheeler's claim fails to survive summary judgment for two reasons. First, he has not adduced evidence supporting the accusation that Mitchell deliberately sent the July 2020 letter to the wrong address, let alone with the aim of jerry-rigging Wheeler's termination. And even if Wheeler had adduced non-speculative evidence to this effect, he has not pointed to any suggesting that Mitchell engaged in this ploy out of aversion to Wheeler's race or disability. *See Marseille*, 2021 WL 3475620, at *11 (discrimination claim requires "evidence to link [d]efendants' conduct to [p]laintiff's protected characteristics"). Before the July 2020 letter, Wheeler missed several deadlines related to his leave, leading Mitchell to send him a letter in late May 2020 directing Wheeler to contact PST lest he "be deemed to have voluntarily resigned [his] Praxair employment." Mitchell Decl., Ex. 4. Thus, in addition to the PST handbook which stated that failure to comply with documentation requirements while on leave could result in

being deemed to have voluntarily resigned, JSF ¶ 6, within two months of the misdirected July 2020 letter, Mitchell had demonstrably sent Wheeler a similar warning putting him on notice of company policy regarding the need to stay current on leave paperwork and the consequences for not doing so.  Wheeler has not produced evidence explaining why racial animus would motivate Mitchell to deceive Wheeler late in, but not in the early months of, his leave.

In an attempt to fill this void, Wheeler points to his allegations of racialized commentary in the PST workplace, reviewed above.  But none of these comments are attributed to Mitchell or linked to the events surrounding termination.  Wheeler emphasizes the unfairness of terminating him based on a failure, during the early months of the pandemic, to respond to a notice sent to an outdated address.  Pl. Br. at 15; Wheeler Decl. ¶ 109.  But, however harsh this outcome, it does not follow that these events flowed from racial discrimination.   Wheeler responds generally that white employees on leave were given more leeway without being terminated.  *See* JSF ¶ 54.  But Wheeler does not cite evidence on which a jury could find any such employee to be a fair comparator with respect to the circumstances surrounding his termination.  Wheeler notes, for example, that Benson and Minucci took extended medical leaves and were permitted to return to PST.  *Id.*  But, critically, he does not adduce evidence that either failed to respond to required notices as he was found to have done, or failed to renew their leave paperwork.

Wheeler's disability discrimination claim similarly fails for want of evidence supporting an inference of discrimination.  Wheeler again accuses Mitchell of intentionally mailing the notice to an outdated, wrong address on account of Wheeler's disability, but again does not recite admissible evidence supporting that theory.  The assembled evidence, if anything, undermines this claim: Wheeler had been granted disability leave in 2015, JSF ¶ 26, had been granted leave without incident in 2020 as well, *id.* ¶ 27, and had been alerted, including by Mitchell, to the

procedural steps to take to apply to extend such leave, Mitchell Decl., Ex. 4. And Wheeler has not adduced evidence contravening PST's documentary proof showing that he missed deadlines set by it and its disability insurance provider, The Hartford, to submit documentation to support his ongoing leave. *See* JSF ¶¶ 29–44. Indeed, Wheeler has not adduced statements or writings by any person at PST indicative of prejudice against him or any other disabled person. To the contrary, Wheeler suggests that Mitchell had been consistently helpful to him through the time he declined to come in off leave to train a new employee. Wheeler Decl. ¶ 107 ("From when I first took my leave in March 2020 through June 1, 2020, I was in regular communication with Nicole Mitchell via phone and email. She made it a practice to contact me when there was an issue with my documentation or if I had missed any deadlines[.]").

Because Wheeler has failed to adduce evidence making out a *prima facie* case of race or disability discrimination, the Court grants summary judgment to PST on these claims.[12]

### D.    Retaliation Claims Under NYSHRL and FMLA

In his final pair of claims, Wheeler asserts that he was retaliated against for engaging in protected activity. In his claim under the NYSHRL, Wheeler claims that the protected activity entailed reporting instances of racial prejudice. Pl. Br. at 21–23. In his claim under the FMLA, Wheeler claims that the protected activity was declining to return to work while out on leave. *Id.* at 23–24.

---

[12] For much the same reasons as above, even had the Court found a *prima facie* case of such discrimination, the assembled record would require entry of summary judgment for PST on the third *McDonnell Douglas* step. Wheeler has not adduced any evidence rebutting PST's factual showing that Wheeler was terminated for the non-discriminatory reason that he failed to submit the paperwork required to extend his leave, and thereafter did not resume work.

1.    **NYSHRL Retaliation**

The NYSHRL makes it unlawful for an employer to retaliate or discriminate against an employee because he "has opposed any practices forbidden under this article or because . . . he has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law ¶ 296(7). The *McDonnell Douglas* burden-shifting framework applies to retaliation claims under the NYSHRL. *See Summa v. Hofstra University*, 708 F.3d 115, 126 (2d Cir. 2013). To make a *prima facie* showing of retaliation, a plaintiff must establish "(1) that she participated in an activity protected by [NYSHRL], (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).

The Court assumes *arguendo* that the evidence would enable Wheeler to establish the first three elements. First, there is documentation of complaints that Wheeler made to PST, including about Minucci's comments surrounding MLK Day and Koodin's outburst towards him, although the latter complaint did not, even implicitly, refer to race. *See* Wheeler Decl., Ex. I (Koodin Email); *id.*, Ex. J. (Hotline Summary regarding Koodin incident). Second, Mitchell acknowledges that Wheeler reported Minucci's comments about MLK Day to her, although the date of this report is not established. *See* Mitchell Dep. at 155–56. And, third, Wheeler ultimately experienced an adverse employment action—his termination.

Wheeler, however, has not pointed to any evidence supporting a causal connection between his complaints and his termination (or the adverse actions, such as non-promotions, that he claims). Wheeler argues that, because he ostensibly reported discriminatory behavior often

and loudly,[13] this protected activity must have occurred sufficiently close to some adverse action

to give rise to a temporal inference of causation.  Pl. Br. at 23; *see also Summa*, 708 F.3d at 127

(temporal proximity of protected activity and adverse actions can be enough to establish causal

connection).  But Wheeler does not support this claim with any allegation as to the timing of his

complaints relative to his termination (or any other adverse action), or any other evidence that

PST's decisionmakers as to these actions had retaliatory motives.  The Court accordingly grants

summary judgment to PST on Wheeler's NYSHRL retaliation claim.[14]

### 2.   FMLA Retaliation

The FMLA entitles eligible employees to 12 work weeks of unpaid leave per year.  29

U.S.C. § 2612(a)(1).  While an employee is on FMLA leave, it is "unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by

the FMLA.  *Id.*  A plaintiff may bring a claim under the FMLA alleging retaliation with such

rights.  As with the NYSHRL, such claims are governed by the *McDonnell Douglas* framework.

*See Roberts v. Health Ass'n*, 308 F. App'x 568, 570 (2d Cir. 2009) (summary order).

Wheeler argues that PST unlawfully retaliated against him, in that Mitchell stopped

communicating with him after he chose in early June 2020 not to return to work to train an

employee, and thereafter (allegedly intentionally) sent his notice letter to the wrong address.  *See*

Pl. Br. at 23–24.  PST counters that its request that Wheeler return to the warehouse to train a

---

[13] Wheeler's brief claims that he was "extremely vocal about his opinion regarding the discrimination he endured," Pl. Br. at 23, but his testimony was that he often declined to report racist incidents based on his belief they would not be addressed, *see* Wheeler Dep. at 156–57.

[14] Even assuming that a finder of fact could find an inference of retaliation to support a *prima facie* case, Wheeler's NYSHRL retaliation claim would fail for reasons explained *infra* in connection with Wheeler's FMLA claim.  Wheeler has not adduced evidence from which a reasonable jury could conclude that PST's stated reason for Wheeler's termination, his failure to meet documentary deadlines in connection with his leave and to seek to extend his leave, was pretextual.

coworker did not infringe on his FMLA rights such that Wheeler, in declining, did not engage in a protected activity.  Def. Br. at 24–25; Def. Reply Br. at 10.  PST also disputes that Mitchell's alleged cessation of regular communications with him and sending a notice to the wrong address were adverse employment actions, or that the evidence can establish a causal connection between these actions and earlier protected activity of Wheeler's.  Def. Br. at 24–25; Def. Reply Br. at 10.

a.  Prima facie *case*

The evidence would permit a reasonable jury to find that Wheeler engaged in protected activity in declining to return to work to train a co-worker.  Although voluntary work is not a *per se* violation of the FMLA, an employer cannot coerce an employee to work during FMLA leave. *See, e.g.*, 29 C.F.R. § 825.220(d) ("[FMLA does not] prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a light duty assignment while recovering from a serious health condition."); *Massey-Diez v. Univ. of Iowa Comm. Med. Servs., Inc.*, 826 F.3d 1149, 1158 (8th Cir. 2016) (citing 29 C.F.R. § 825.220(d)).  The record surrounding these events – emails between Wheeler and Mitchell in early June 2020 – does not support that PST attempted to coerce Wheeler to return to work. *See* Mitchell Decl., Ex. 7. Nonetheless, Wheeler persuasively argues that a corollary of the FMLA right not to be coerced to work during FMLA leave is a right to decline to return to work when asked to do so, even if that request was in voluntary terms.  A jury could thus find that Wheeler exercised a protected right under the FMLA by declining to take on work while on leave.

A jury could also find that PST was aware of this protected activity, insofar as Wheeler communicated to Mitchell his intention not to return. *See id.*

Further, a jury could find that Wheeler suffered an adverse employment action when he was terminated.  Wheeler's alternative theories of how he suffered an adverse action – that

Mitchell allegedly reduced her communications with him and allegedly deliberately misdirected a notice to him -- do not find support in the case law as "materially adverse" actions. *See, e.g., Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) ("An adverse employment action is a materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities" (internal quotation marks omitted); *cf. Ray v. New York State Insur. Fund*, 16 Civ. 2895, 2018 WL 3475467, at *11 (S.D.N.Y. July 18, 2018) (denial of plaintiff's request work remotely was not an adverse employment action as "it did not inconvenience her but rather denied her a convenience). But termination of employment is a quintessentially adverse action, *see Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020), and a reasonable jury could find that, when PST declared Wheeler's "voluntary resignation" when he did not mean to do so, it was in fact a termination.

Finally, Wheeler adduces just enough evidence to make out the fourth prong of a *prima facie* case: a causal connection between his exercise of a protected right and the adverse action (his loss of employment). "At the *prima facie* stage, a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her protected activity and the materially adverse action that she allegedly suffered in retaliation for engaging in that activity." *Risco v. McHugh*, 868 F. Supp. 2d 75, 114 (S.D.N.Y. 2012). Although the Second Circuit has not drawn a bright-line rule as to how close in time the protected activity need be to the adverse action to give rise to this inference, *see Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554–55 (2d Cir. 2001), periods of three months or less have often been held close enough to give rise to an inference of a causal connection. *See, e.g., id.* at 555 (five month gap between protected activity and retaliatory act sufficiently close to support a causal inference); *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 393 (S.D.N.Y.

2019) (approximately two-month gap between protected activity and retaliatory act supported inference of causal connection); *Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., Indus. Emps., Warehousemen, Helpers & Miscellaneous Workers, Greater New York & Vicinity, Loc. Union No. 812*, 425 F. Supp. 3d 234, 241 (S.D.N.Y. 2019) (slightly over two-month gap between protected activity and adverse employment action sufficient to give rise to causal connection between the two).

The documentary evidence supports that Wheeler engaged in his protected activity (declining to return to work while on FMLA leave) in early June 2020, JSF ¶ 36; Mitchell Decl., Ex. 8 at 2, and his termination occurred on July 27, 2020, Mitchell Decl., Ex. 12. Thus, less than two months passed between the protected activity and the adverse employment action. Wheeler has adduced enough to establish the fourth and final element of a *prima facie* FMLA retaliation claim.

### b. *Legitimate non-discriminatory reasons for termination*

PST has come forward with legitimate, non-discriminatory reasons for Wheeler's termination. Under PST's leave policy as memorialized in its employee handbook, "[i]f an employee fails to return to work at the expiration of his or her leave . . . the Company may presume that the employee does not plan to return to work and has voluntarily terminated employment with the Company." JSF ¶ 6. It is undisputed that, as of June 2020, Wheeler had exhausted his FMLA and STD leave, Mitchell Decl., Ex. 12 at 2, and had failed to extend his leave period by submitting required paperwork, *see id.* As such, PST contends that its July 27, 2022 notice to Wheeler that he had been deemed to have voluntarily resigned was simply a rote application of PST's leave policy precipitated by Wheeler's own inattention to paperwork and deadlines. *See* Def. Br. at 17; Def. 56.1 ¶¶ 72–75. An employee's failure to follow established

procedures governing absence from work or leave periods can be a legitimate—indeed, is a

familiar—non-discriminatory basis for an adverse employment action. *See Mayo v. Columbia

Univ.*, No. 01 Civ. 2002 (LMM), 2003 WL 1824628, at *6 (S.D.N.Y. Apr. 7, 2003) (failure to

comply with return to work agreement legitimate reason for termination); *Sedor v. Frank*, 42

F.3d 741, 746–47 (2d Cir.1994) (failure to obtain authorization for absence legitimate reason for

termination); *Glover v. City Univ. of N.Y.*, No. 96 Civ. 7961 (PKL), 1997 WL 411443, at *4

(S.D.N.Y. July 18, 1997) (failure to apply for extension of leave or contact employer legitimate

reason for termination). PST has satisfied its burden at this prong.

c. *Pretext*

Wheeler has not put forward evidence from which a reasonable jury could find PST's

legitimate reason for his termination pretextual. Wheeler has not identified evidence, direct or

circumstantial, linking PST's determination that he had voluntarily resigned to his earlier

decision not to return to work to train a colleague. He has not pointed to any writing or

testimony supporting this thesis. And the uniform documentary evidence attributes PST's

conclusion that Wheeler had resigned to Wheeler's failures to respond to The Hartford's notice

and to timely seek to extend his leave. Wheeler has not cited any evidence that between June 19,

2020, when Wheeler informed PST of his address change, *see* JSF ¶ 38; Wheeler Decl., Ex. L.,

and July 29, 2020, when Wheeler contacted The Hartford about the cessation of his benefits on

July 5, 2020, *see* Wheeler Decl. ¶¶ 123–26, that he took any action to extend his disability leave.

Under these circumstances and given these intervening events, a jury could not, other than by

speculation, attribute PST's decision to treat Wheeler as having resigned to retaliation for his

refusal in early June to return to work to train a colleague. *See Gubitosi v. Kapica*, 154 F.3d 30,

33 (2d Cir. 1998) (intervening events undermine temporal inference of causal connection);

46

*Joseph v. Marco Polo Network, Inc.*, No. 09 Civ. 1597 (DLC), 2010 WL 4513298, at *18
(S.D.N.Y. Nov. 10, 2010).

The lynchpin of Wheeler's pretext argument—his claim that Mitchell intentionally
misdirected the July 2022 warning letter to the wrong address to discriminatorily bring about
Wheeler's imputed resignation – lacks evidentiary support.  The only communications in the
record surrounding PST's request that Wheeler return to work to do training do not evince any
animus or even frustration on Mitchell's part.  *See* Mitchell Decl., Ex. 8 (undated email from
Mitchell to group of PST employees stating: "Sean [Wheeler] . . . is saying hi wife may be able
to take vacation for a week and would be able to drive him.  If this is something we want to
explore we . . . need the Dr. to validate that he can perform these functions."); *id.*, Ex. 9 (email
from Mitchell to group of PST employees dated June 8, 2020 responding when asked about
Wheeler's potential return: "Sean called this morning and he does not expect to be back any time
soon.  His Dr is still trying to schedule a surgical procedure.  We will see what updated
information Aetna/The Hartford sends to us with any new dates.").  This evidence instead
indicates that Mitchell's quotidian communications to Wheeler were prompted by requests by
others at PST.  And it is undisputed that the impetus for Mitchell's thereafter sending Wheeler
the warning letter was his failure to apply to renew his leave.  *See* JSF ¶ 37, Mitchell Decl., Exs.
9, 10, 12.  These writings corroborate PST's stated legitimate reason for Wheeler's termination.
No reasonable jury, reviewing the record, could conclude that Mitchell acted out of retaliatory
animus, or that PST's stated, and legitimate. business reason was in fact a pretext.

The Court accordingly grants summary judgment to PST on Wheeler's FMLA claim.[15]

---

[15] The Court has thus dismissed Wheeler's only federal claim.  Wheeler, however, brought this
case on the basis both of federal question jurisdiction and diversity jurisdiction.  *See* Complaint

## CONCLUSION

For the foregoing reasons, the Court grants PST's motion for summary judgment on all claims, save for Wheeler's hostile work environment claim under the NYSHRL based on conduct on or after October 11, 2019.  That claim will proceed to trial.

The Court directs the parties promptly to confer, and, by **October 13, 2023**, to submit a joint pretrial order consistent with the Court's Individual Rules governing jury trials.  Any motions *in limine* are due on the same date as the joint pretrial order; opposition briefs are due one week later.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 26, 2023
New York, New York

---

¶¶ 13–14.  The Court therefore retains jurisdiction over Wheeler's remaining state-law claim and does not have occasion to consider whether prudentially to exercise supplemental jurisdiction.